IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DAVID WILSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-CV-284-WKW |
| | ) | [WO] |
| JOHN Q. HAMM, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court is petitioner's Renewed Motion for Disclosure of Ongoing *Brady* Material (Doc. 60).  Petitioner seeks disclosure of a letter in which one of his accomplices in a robbery plot confessed to bludgeoning the victim petitioner was convicted of murdering.  For the following reasons, the motion will be GRANTED.

## I.  BACKGROUND

Petitioner, David Wilson, was convicted of the April 2004 murder of Dewey Walker in Dothan, Alabama.  The State's evidence at trial showed that petitioner and Matthew Marsh, Catherine "Kitty" Corley, and Michael Jackson plotted to rob Walker of, among other things, an expensive array of stereo equipment outfitted in Walker's customized van.  The State's theory was that, whatever his role in planning the robbery with Marsh, Jackson, and Corley, petitioner alone inflicted the injuries—

including severe and repeated blunt force trauma and strangulation—that resulted in Walker's death.

The particulars of the State's evidence, and how it was obtained, are relevant to resolving the instant motion. After Walker failed to show up at work for several days, and his supervisor unsuccessfully attempted to contact him at his home, Dothan police were summoned to the residence to conduct a welfare check. *Wilson v. State*, 142 So. 3d 732, 748 (Ala. Crim. App. 2010). Police discovered evidence of a forced entrance at the rear of Walker's home: an exterior door that led into a storage room was missing a doorknob, and a wall separating the storage room and a bedroom had been breached, leaving a hole large enough for an adult to enter the bedroom. Police entered the home through the hole and found Walker's body lying in his kitchen with a large pool of dried blood surrounding his head. *Id.* at 749.

Within a day of finding the body, Dothan Police Investigator Tony Luker interviewed Marsh about Walker's missing van and the stereo equipment. Marsh led Luker to Corley and Jackson, and then to petitioner. *Id.* Petitioner waived his *Miranda* rights and gave a statement to investigators. The Alabama Court of Criminal Appeals ("ACCA") summarized the statement, which was presented at petitioner's trial, as follows:

> Wilson told the officers that he went to Walker's house around 3 p.m. on April 6. Walker was home, and Wilson spoke to him about Walker's son Chris. Wilson left, but came back a few hours later. Wilson said that the front door was partially open when he returned, so

2

he walked into the house. Walker was not home when Wilson arrived. While Wilson was inside Walker's house, he received a telephone call from Marsh, asking him to steal the keys to Walker's van. Wilson explained to the officers that he, Marsh, Jackson, and Corley had previously discussed "hitting Mr. Walker and knocking him out and taking the keys." Wilson took the keys and went to Marsh's house.

According to Wilson, he returned to Walker's house the next evening to steal a laptop computer. He went to the back of the house and entered the storage area. Wilson stated that there was a small crack in the wall and that he made it large enough to enter the main house. Wilson took a metal baseball bat with him because, according to him, he was scared of Walker's dog. Once inside, he again received a telephone call from Marsh asking him to search for items in addition to the laptop that would be worth stealing. Wilson used a screwdriver to pry open several doors in the house.

After approximately 20 minutes, Walker returned home and went to the kitchen. Wilson assumed that Walker heard him because he picked up a knife. Wilson said that he approached Walker from behind with the baseball bat and attempted to disarm Walker by striking him on his right shoulder. According to Wilson, he missed and accidentally struck Walker in the back of his head. Walker fell into the wall, cutting his head, but stood back up. Wilson grabbed a nearby computer-mouse cord and wrapped it around Walker's neck in an attempt to make Walker drop the knife. The computer-mouse cord snapped, so Wilson grabbed a nearby extension cord. Wilson stated that he wrapped the extension cord around Walker's neck and held it until Walker passed out. He estimated that he choked Walker for six minutes. Wilson told the officers that he threw the extension cord down in front of the refrigerator and placed the computer-mouse cord inside the refrigerator. Wilson was scared, so he left the house, taking with him Walker's laptop and one of Walker's baseball hats. Wilson further indicated that he did not telephone an ambulance for Walker because he was in a state of panic. According to Wilson, Walker was still breathing when he left.

Wilson went back to Marsh's house where he, Marsh, and Corley unsuccessfully attempted to login to Walker's password-protected laptop. The three individuals then went back to Walker's house in order

3

to steal the van. During their first attempt to take the van, however, the alarm on the van went off, so they left.

Wilson made similar attempts to steal Walker's van on Thursday and Friday, but was foiled both times by the alarm on the van. Wilson spoke with Corley, who was familiar with alarm systems, about disabling the alarm in Walker's van. Wilson returned to the van on Sunday morning. He lifted the hood of the van to access the alarm system, and the alarm again sounded. Wilson left and drove around for about 20 minutes before returning. When he returned, he was able to disable the alarm system by cutting two wires. Wilson drove to Marsh's house, picked up Marsh, and drove back to Walker's house. Wilson drove the van to Marsh's house. At Marsh's house, they removed the stereo equipment from the van and split it among Wilson, Marsh, Jackson, and Corley. Then they hid the van on Marsh's property located outside the city limits of Dothan.

*Id*. at 749-50 (footnotes and citations omitted).

According to the forensic pathologist who conducted Walker's autopsy, Walker sustained injuries grossly inconsistent with petitioner's statement.   In particular, Walker had numerous defensive wounds on his hands and arms and suffered at least "114 contusions and abrasions on [his] body, 32 of which were on his head."   *Id*. at 750.   There were "multiple skull fractures and three separate lacerations" on Walker's scalp, as well as eight broken ribs and a fractured sternum. *Id*.  The pathologist opined that these injuries could not have been caused by the single blow and fall described by petitioner in his statement to police.  *Id*.  In his guilt phase closing argument, the prosecutor attributed all these injuries to petitioner. *See* Vol. 9, R. 606-09.  The prosecutor also emphasized the number of blunt force injuries Walker sustained in arguing at the penalty phase that petitioner should be

4

sentenced to death, *see* Vol. 10, R. 764:20-765:11, and, as he did in the guilt phase, he attributed these injuries to petitioner.  *Id.*, R. 783:24-784:10; 790:24-791:3.

Although omitted from the ACCA's opinion, petitioner's statement described other events pertinent to the instant motion.[1]  Petitioner told investigators that, after his confrontation with Walker, "Kitty was wanting to see the body."  So, in one of their early attempts to steal the van, petitioner and Corley together entered the house.  Petitioner said he stayed in Walker's bedroom while Corley went to the kitchen area to see Walker's body:

> I told her like I stayed right there it's like I ain't gone go that far cause I know what I, happened and all and I'm freaking out about it.  I told her how to get there go straight up that walkway right there and take a left. . . .  She went through there and she saw it.

Petitioner also described Corley's demeanor after she viewed the body:

> She, she was, she was kind of I don't know what was her, what her, she seem like she said she got a little thrilled with it or some . . . something like that.  She said she guess she was excited I don't know what was up with her.
> . . .
> I asked her if she was ok.  She said yeah sure.  Cause she use, cause she use to do stuff like that or something like that.  I don't know exactly what was up with her, what her story is.  Cause she's got in some weird cult thing.

---

[1] The transcript of petitioner's statement to police is located in Vol. 3, C.R. 498-517, of the state court record.  *See* Doc. 59-3 at 115-134.

Petitioner's statement does not indicate how long Corley was away viewing Walker's body.  Nor does he indicate that he heard any sort of commotion or activity during that time.

In her own statement, Corley advised that she was at Marsh's house when petitioner called and told Marsh that he had killed Walker.  Corley told investigators that, because petitioner was known to tell "stories," she stated that she wanted to see the body so that she could prove that petitioner was lying.  She admitted to entering the house with petitioner and viewing Walker's leg from a hall area near the bedroom where the two had entered.  She and petitioner then looked around for keys or other items to steal before leaving.  Corley did not testify at petitioner's trial and her statement was not admitted into evidence.[2]

After petitioner was convicted and sentenced to death, the ACCA, conducting plain error review, remanded to the Houston County Circuit Court to conduct a *Batson* hearing and make written findings of fact respecting petitioner's claim that the State exercised peremptory challenges in a racially discriminatory manner at his trial.  *Wilson*, 142 So. 3d at 747-48.  On return to remand, the conviction and sentence were affirmed by the ACCA.  *Id*. at 819.  The Alabama Supreme Court

---

[2] Corley's statement to police is attached as exhibit 7 to petitioner's amended Rule 32 petition and can be found in Vol. 24, C.R. 624-632, of the state court record.  *See* Doc. 59-24 at 25-33.

denied certiorari review, *Ex parte Wilson*, No. 1111254 (Ala. Sept. 20, 2013), as did the United States Supreme Court. *See Wilson v. Alabama*, 572 U.S. 1118 (2014).

Petitioner next sought post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. In his Rule 32 petition, he alleged, for the first time, a violation of his due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, he alleged that prosecutors possessed and failed to disclose before trial a letter written by Corley in which she stated that she had beat Walker with a baseball bat until he fell. Rule 32 Pet. at 17, Vol. 22, Tab #R-53. According to the Rule 32 petition, Corley had written the letter to another detainee at the Houston County Jail, and that detainee provided the letter to the detainee's attorney, who then provided the letter to prosecutor Douglas Valeska and Investigator Luker. Luker subsequently obtained and executed a search warrant for Corley's jail cell where he seized other writing samples which Corley admitted to writing. The letter and other writing samples were then provided to a United States Postal Service Inspector, who submitted them for analysis by a handwriting expert. The expert opined that the letter and other handwriting exemplars were probably written by the same person.

According to the Rule 32 petition, despite possessing the Corley letter and apparently investigating its provenance, prosecutors did not disclose the letter or the

handwriting expert's report to the defense.[3]   Instead, prosecutors provided the defense with discovery that included a series of police "offense reports," one of which briefly described the circumstances of the acquisition of the letter and the subsequent investigation.  Rule 32 Pet. at 116.  In pertinent part, the offense report stated that, in addition to the writer's claim to have "hit Mr. Walker with a baseball bat until he fell," the letter "contained details of the murder of Dewey Walker which only the perpetrators would have known."  The offense report further described the subsequent investigation into the letter and concluded with Luker's opinion that, after having compared the Corley letter with other known Corley writing samples, he believed Corley wrote the letter.

In his Rule 32 petition, petitioner alleged two claims related to the Corley letter: the *Brady* claim and a claim that his counsels' failure to further investigate Corley's confession, despite the reference to it in the provided discovery, rendered counsels' assistance ineffective in both the guilt and penalty phases of his trial.  The Circuit Court denied both claims.  On appeal of the denial of the Rule 32 petition,

---

[3]  This failure to disclose occurred notwithstanding the Circuit Court's entry of its "Reciprocal Discovery Order," which required that the State "make any exculpatory materials available to the defense."  It was also despite the defense's pretrial motion for discovery of the prosecution's files, including all *Brady* material.  That motion specifically requested that the defense be provided with any statement made by, among others, Catherine Corley, any document relating to any statement made by Corley respecting the robbery and murder of Walker, and any document concerning favorable or exculpatory evidence provided by, among others, Corley.  It is inarguable that petitioner specifically requested, prior to trial, the disclosure of the precise material that would include the Corley letter.

the ACCA affirmed.  The ACCA upheld the Circuit Court's ruling that the *Brady* claim was procedurally barred because the police offense reports provided to petitioner's trial counsel in discovery made counsel aware of the Corley letter and related expert report and, accordingly, petitioner could have raised the *Brady* issue at trial or on direct appeal.  Vol. 33, Tab #R-68, p. 8-9.  On the guilt phase component of the ineffective assistance claim, the ACCA agreed with the Circuit Court that the claim was insufficiently pleaded because petitioner failed to plead facts showing that the Corley letter would have been admissible at his trial and, accordingly, failed to show that he was prejudiced by any deficiency in failing to investigate Corley's confession.  *Id*. at 21.  As to the claim of penalty phase ineffectiveness, the ACCA concluded that petitioner could not show prejudice because Corley's letter "would establish, at most, that [petitioner] had an accomplice in his beating and strangling Walker to death.  Evidence that an accomplice was involved is not mitigating." *Id*. at 50-51.  The Alabama Supreme Court denied certiorari, *Ex parte Wilson*, No. 1170747 (Aug. 24, 2018), as did the United States Supreme Court.  *Wilson v. Alabama*, 139 S.Ct. 1620 (April 29, 2019).

Petitioner next filed his federal habeas petition, again alleging the Corley-related *Brady* and ineffective assistance claims rejected by the state courts.  Shortly after current counsel was substituted for predecessor counsel, petitioner filed his initial motion to require respondent to disclose the Corley letter.  *See* Doc. 29.  The

Magistrate Judge held a hearing on the motion on January 23, 2020.  At the hearing, respondent's counsel objected to disclosing the letter in federal habeas, dismissing the letter as a "red herring" and describing the obligation to produce it at this stage as "extraordinary."  Doc. 42 at 22:22-23:1.  The Magistrate Judge expressed his aggravation with respondent's refusal to disclose the letter and further stated his hope "the State would reconsider its technical legal position, which still strikes me as bonkers."  *Id.* at 28:21-22, 29:7-9.  In a subsequent written order, however, the Magistrate Judge denied the initial motion for disclosure for two reasons.  *First*, the Magistrate Judge concluded the motion was premature because respondent had not yet filed an answer and the state court record.  Doc. 43 at 3.  *Second*, the Magistrate Judge found that petitioner could offer only speculation that the letter, outside of the portions disclosed in the police report, might be exculpatory, and that such speculation rendered his motion defective.  *Id.*

Shortly after the Magistrate Judge's January 2020 order, these proceedings entered a long period of pandemic-related dormancy.  Then, in August of last year, the Magistrate Judge ordered respondent to file the state court record, which respondent filed in October.  The instant motion, petitioner's renewed motion for disclosure of the Corley letter, followed.  This is the only issue before the court at this time.

## II.  DISCUSSION

As a preliminary matter, the parties acknowledge that this court has the authority to order discovery in federal habeas proceedings pursuant to Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts.  Rule 6 makes such discovery discretionary and requires that the movant show "good cause" to conduct the requested discovery.  Good cause exists when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief[.]"  *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quotation and citation omitted).  Where the movant has met this burden, it is incumbent on the district court "to provide the necessary facilities and procedures for an adequate inquiry."  *Id*. at 909.  Hence, while, as discussed below, the parties dispute whether *Brady* itself provides any authority for an order of disclosure in this habeas proceeding, it is undisputed that this court has the authority to award discovery, or otherwise "provide the necessary facilities and procedures for an adequate inquiry," where the court finds "good cause" to do so.

Petitioner argues that he is entitled to disclosure of the Corley letter because respondent "has an *ongoing* legal duty to disclose exculpatory evidence to Mr. Wilson that was available at the time of his original trial."  Doc. 60 at 2 (emphasis in original).  He maintains that this duty exists throughout all stages of the judicial

process, including state postconviction and federal habeas proceedings, and is not terminated or otherwise impacted by his conviction or the conclusion of his direct appeal.  *Id*.  He asserts that evidence that Corley beat Walker with a baseball bat until he fell down was exculpatory and that suppression of such evidence "casts clear doubt on the validity and fairness of [his] conviction and sentence."  *Id*. at 7.  According to petitioner, such evidence was exculpatory and material because it provides an explanation for the numerous injuries found on Walker's body, injuries that were inconsistent with petitioner's own admission of having hit Walker with a bat one time.  *Id*. at 19.  Thus, the letter "demonstrates that Kitty Corley was the one who killed Mr. Walker with a baseball bat."  *Id*.

Respondent opposes the motion on several theories.  *First*, respondent argues that the State is under no ongoing duty to disclose exculpatory evidence under *Brady* in a postconviction setting.  Doc. 64 at 2-5.  *Second*, respondent contends that petitioner is not entitled to disclosure because "the State *never suppressed* the Corley letter."  *Id*. at 6 (emphasis in original).  *Third*, respondent asserts that disclosure is not warranted because petitioner's *Brady* claim is procedurally defaulted.  *Id*. at 7.  *Fourth*, respondent maintains that the Corley letter is not exculpatory because the evidence at trial showed that the numerous blunt force injuries Walker sustained were delivered before he was strangled by petitioner.  *Id*. at 8-9.  According to

respondent, this "would tend to discredit any theory that relied on Ms. Corley arriving on the scene later and striking additional blows." *Id*. at 9.

Ultimately, respondent's arguments against disclosure are unpersuasive. Respondent's position on the main point of contention between the parties—whether the State's *Brady* obligation is ongoing—is specious.  To be sure, the Supreme Court has described the State's duty to disclose as "ongoing," *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987), and the seminal authority outlining the due process right at issue, *Brady v. Maryland*, is plainly analogous.  There, Brady and his co-defendant were convicted of murder and sentenced to death.  373 U.S. at 84.  Prior to trial, Brady's counsel "requested the prosecution to allow him to examine" all the co-defendant's extrajudicial statements.  *Id*.  Several such statements were provided to counsel, but one, in which the codefendant "admitted the actual homicide," was withheld by the prosecution and "did not come to [Brady's] notice until after he had been tried, convicted, and sentenced, and after his conviction had been affirmed."  *Id*.

As any law student should know, the Supreme Court held that "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  While the mechanics of how the suppressed statement "c[a]me to petitioner's notice" in the postconviction forum are not revealed in the opinion—*i.e.*, whether it was discovered through post-

13

conviction court process, voluntary but delayed disclosure, or independent investigation—nothing in *Brady* suggests that the State's duty to disclose the codefendant's confession ceased upon Brady's conviction.

Notwithstanding that *Brady* therefore does not support his position, respondent has failed to cite any other case holding that, with respect to exculpatory evidence possessed by the State before trial, which is what is alleged to be at issue here, the State's duty to disclose is somehow extinguished if it succeeds in suppressing such evidence until the trial or direct appeal is concluded. Instead, respondent's chief authority for his position appears to be *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009), but that decision is distinguishable.

In broad terms, *Osborne*, unlike this action, was not a collateral challenge to a state court conviction. Rather, it was a civil lawsuit pursuant to 42 U.S.C. § 1983 in which the plaintiff sued to vindicate a supposed "freestanding" right to obtain postconviction DNA testing of trial evidence. 557 U.S. at 55-56. As the Supreme Court framed it, the issue in *Osborne* was simply whether there is a "right under the Due Process Clause to obtain postconviction access to the State's evidence for DNA testing." *Id*. at 61-62. The Supreme Court concluded that the due process right of *Brady* does not require postconviction access to evidence for purposes of conducting new DNA testing and analysis. *Id*. at 68-69. This is so because "[a] criminal

defendant proved guilty after a fair trial does not have the same liberty interests as a free man." *Id*. at 68.  As the Supreme Court observed, Osborne's due process right to particular postconviction procedures, like DNA testing, "is not parallel to a trial [read: *Brady*] right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." *Id*. at 69.  Hence, as the Supreme Court summarized, "*Brady* is the wrong framework" for analyzing the due process right pressed by Osborne.  *Id*.

Of course, a conviction aided by a local prosecutor's intentional suppression of exculpatory evidence, per *Brady*, has not been obtained fairly, and therein lies the distinction that controls here.  Osborne presented no *Brady* claim dating to the time of his conviction.  His § 1983 suit was not premised on some allegation that prosecutors suppressed any exculpatory or otherwise favorable evidence prior to his trial.  Indeed, he did not even argue that *Brady* supplied him with the postconviction right to perform the DNA testing he sought.  That was a peculiar innovation of the Ninth Circuit Court of Appeals that the Supreme Court curtly rejected.  557 U.S. at 68.  In short, nothing in *Osborne* or any other case cited by respondent suggests that a conviction vitiates the State's duty to disclose favorable evidence indisputably in its possession at the time of the conviction.  Respondent therefore has not shown that he may avoid disclosure of the Corley letter merely by asserting that the State's *Brady* obligation no longer exists.

The remainder of respondent's arguments against disclosure are unpersuasive because, in essence, he asks this court to deny disclosure of alleged *Brady* material because the underlying *Brady* claim is without merit, yet he would have the court adopt his merits arguments while denying petitioner and the court the ability to review the alleged *Brady* material from which he derives those arguments.[4]   For pragmatic and prudential reasons, the court declines to do so.

Two of respondent's submitted bases for denying disclosure go straight to the merits of the *Brady* claim.  The traditional articulation of the *Brady* test is familiar:

> To establish a *Brady* violation, a defendant must prove three essential elements: (1) that the evidence was favorable to the defendant, either because it is exculpatory or impeaching; (2) that the prosecution suppressed the evidence, either willfully or inadvertently; and (3) that the suppression of the evidence resulted in prejudice to the defendant.

*Rimmer v. Sec'y, Fla. Dept. of Corr.*, 876 F.3d 1039, 1054 (11th Cir. 2017) (citations omitted).  Here, respondent argues both that there was no suppression of the Corley letter and that the letter is not exculpatory.  Doc. 64 at 6-9.  On the suppression component of the test, respondent argues that "the Corley letter, or at the very least its material substance, was disclosed to [petitioner] in *pre-trial discovery*."  *Id*. at 6

---

[4] This is no distortion of respondent's position.  At the hearing on the first motion to disclose, the Magistrate Judge expressed his unequivocal belief that the Corley letter, as described in the pleadings, is exculpatory: "I think you're right in the sense this obviously was exculpatory material which should have been turned over."  Doc. 42 at 11:16-18.  When the Magistrate Judge asked respondent's counsel whether he agreed that the letter is exculpatory, counsel demurred: "No, Your Honor, we're not.  Having seen the letter myself."  *Id*. at 21:2-3.

16

(emphasis in original).  Thus, respondent maintains, petitioner "knew – at the very least – that the letter stated Ms. Corley had also struck Mr. Walker and that the State believed that Ms. Corley was its author."  *Id*. at 7.  On the "favorable" component of the test, respondent asserts the Corley letter is not exculpatory because petitioner confessed both to striking Walker in the head and strangling him with two different ligatures for as long as six minutes.  *Id*. at 8-9.[5]

Respondent makes fair points that may prove dispositive of the ultimate merit of petitioner's *Brady* claim if this court is ever tasked with resolving that question. But respondent offers no explanation how—much less why—this court should resolve questions pertaining to the merit of a *Brady* claim without reviewing the alleged *Brady* material, especially where such material is acknowledged to exist and continues to be exclusively in the possession of the State.  Nor does respondent point to another case wherein a court willingly resolved the merit of a *Brady* claim without reviewing for itself the readily available alleged *Brady* material.

Were it apparent that petitioner could not articulate a viable *Brady* or ineffective assistance claim on the facts he has alleged, then perhaps disclosure of

---

[5] Respondent's argument that the Corley letter is not exculpatory because it is inconsistent with other evidence, such as petitioner's own statement, is an argument directed more at the materiality component of the *Brady* test.  As the Magistrate Judge observed at the hearing, evidence that someone else administered the severe beating prosecutors attributed to the defendant is, according to any conventional understanding of the term, "exculpatory."  There may be good reason to discount such evidence, but that question bears on whether intentional suppression of the evidence by a local prosecutor resulted in prejudice to the defendant, not whether the evidence was favorable.

the alleged *Brady* material would not be necessary.  But that is not the case here.  On the suppression component, nothing in the record shows that the Corley letter was disclosed to petitioner.  As to respondent's claim that, even if the letter was withheld, its "material substance" was disclosed via the police reports, petitioner has presented a substantive question of fact and law regarding whether the State may fulfill its *Brady* obligation by disclosing a fragment or summary of *Brady* material in the manner and context in which it is alleged to have done here, especially considering that counsel made a plain pretrial request for the precise material that would include the letter.[6]  Moreover, it is difficult to blindly accept the State's claim that there has been no suppression where the police report that was disclosed references the letter's inclusion of other details about the crime that could only have been known by the perpetrators.  Only respondent knows what those details might be and, if any of them are favorable to petitioner, how such details were not actively suppressed by the State.  Thus, respondent should not avoid disclosure on its mere assurance that there has been no suppression.

---

[6] At best, it appears the Corley confession was disclosed to the defense in a manner designed to not attract attention to it, thus to put the defense at a trial and sentencing disadvantage.  As the Supreme Court has made clear, *Brady*'s disclosure obligation is not readily discharged via gamesmanship: "A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."  *Banks v. Dretke*, 540 U.S. 668, 696 (2004).  Here, a local prosecutor aggressively slighted his obligation to produce *Brady* material, and any expense of these proceedings to the public till results solely from that local decision.

On the favorability component—specifically, respondent's contention that "the Corley letter is not exculpatory"—petitioner pleads facts presenting a substantive question of fact and law whether the letter indeed could be favorable to him. Here, again, *Brady* itself is instructive. At his trial, Brady testified and admitted his involvement with his codefendant in the murder. 373 U.S. at 84. Indeed, his counsel "conceded that Brady was guilty of murder in the first degree, asking only that the jury return that verdict 'without capital punishment.'" *Id.* The Supreme Court held that suppression of the codefendant's statement in which he "admitted the actual homicide" violated Brady's due process rights because it was favorable to Brady and possibly was material at least to his punishment. *Id.* at 86.

Likewise, petitioner here claims that the Corley letter was favorable to him for purposes of both the guilt and penalty phases of his trial. Doc. 1 at 17-18. To be sure, as recounted above, petitioner's own confession was damning and, as respondent argues, supported the jury's verdict that petitioner is guilty of capital murder. It is no stretch, however, to argue that a co-defendant's admission of a possibly greater role in the murder, if not proximate causation of the victim's death, might be a material consideration in a jury's deliberation on whether to recommend a death sentence, even where the defendant has confessed to actions that could have caused the victim's death.

Respondent also argues that, given the ACCA's finding that the letter was inadmissible hearsay, it is "not *Brady* material at all." Doc. 64 at 10. This, too, goes to the merit of petitioner's claim, and, again, perhaps respondent will ultimately prove correct. But, to the extent that this court may be called upon to *independently* consider the merits of petitioner's *Brady* claim – whether for purposes of deciding the instant motion for disclosure, or considering whether petitioner can show cause and prejudice for any asserted procedural default, or if the court is required to decide the claim *de novo* – this court will not follow the ACCA's lead and opine on the admissibility of evidence that it has not reviewed.

Respondent's remaining point in opposition is that no disclosure of the letter is warranted because the underlying *Brady* claim is procedurally defaulted. Doc. 64 at 7. Respondent has pleaded this affirmative defense in his answer, Doc. 56 at 8-10, and comity requires that this court defer to the state court's application of a procedural bar provided it is based upon an adequate and independent state law ground. *See, e.g., Carey v. Dept. of Corr.*, 57 F.4th 985, 992 (11th Cir. 2023). Here again, however, respondent's argument would have the court deny disclosure based on the perceived lack of merit of petitioner's *Brady* claim and, accordingly, does not militate against disclosure of the letter.

As petitioner has argued, *see* Doc. 65 at 15, even if his *Brady* claim is procedurally defaulted, he may obtain a merits review of the claim by demonstrating

cause and prejudice to excuse his procedural default.  *See, e.g.*, *Green v. Sec'y, Dept. of Corr.*, 28 F.4th 1089, 1129 (11th Cir. 2022).  The Supreme Court has held that the State's suppression of evidence constitutes "cause" for the failure to present, and thereby default, a *Brady* claim in the state courts, and that "prejudice" has ensued if the suppressed evidence was "material" for *Brady* purposes.  *Strickler v. Greene*, 527 U.S. 263, 282 (1999).  For this reason, as the Court of Appeals very recently observed, "resolving the merits of a *Brady* claim is essentially required to resolve the procedural default challenge."  *Rossell v. Macon SP Warden*, 2023 WL 34103, at *3 (11th Cir. Jan. 4, 2023).  Because resolving respondent's procedural default defense will require deciding the merits of the *Brady* claim, respondent may not avoid disclosure of the letter by virtue of having asserted his procedural defense.

Several known, simple truths about the Corley letter and its surrounding circumstances collectively illustrate good cause for its disclosure to petitioner.  In the letter, Corley confesses to having hit Walker with a bat "until he fell."  The letter also contains other details about the crime which could only have been known by the perpetrators.  *Prosecutors possessed the letter before trial, investigated its origin, and concluded that Corley was its author*.  Prosecutors presented evidence at trial that Walker in fact endured far more blunt force blows than what petitioner admitted in his statement.  Prosecutors told the jury that petitioner inflicted these many blows and further argued that the beating petitioner dealt Walker warranted application of

the "heinous, atrocious, or cruel" aggravating circumstance at sentencing.  The jury was not told that an accomplice of petitioner's who admitted entering Walker's home also claimed that she beat the victim with a baseball bat while he was alive.  The jury that convicted petitioner of murder recommended a death sentence by the narrowest possible margin of 10-2.  Petitioner is the only defendant convicted of capital murder and sentenced to death for the murder of Dewey Walker.  It is plausible that, depending on what the Corley letter reveals, petitioner might still have been convicted and sentenced to death even if he had been provided with the letter and succeeded in introducing it into evidence.  It is this court's firm conviction, however, that the question of the letter's materiality cannot reliably be resolved without its disclosure.

For the reasons stated above, disclosure of the Corley letter to petitioner is lawful and, importantly, is necessary in aid of the fair resolution of this matter, *i.e.*, due process requires it.  Furthermore, there is no cognizable prejudice to respondent in making such disclosure.  Respondent waives no defense nor compromises any argument by disclosing the letter.  For example, respondent has asserted that the *Brady* claim is procedurally defaulted, and he may continue to assert that defense notwithstanding the disclosure.[7]  Moreover, to the extent it may be determined that

---

[7] Indeed, in another capital habeas case arising out of Houston County, the petitioner was allowed to conduct discovery in support of a *Brady* claim that the court went on to find procedurally defaulted.  *See Hammonds v. Dunn*, Civ. No. 1:05-cv-831-WKW-WC, doc.

review of petitioner's *Brady* or related ineffective assistance claims is governed by 28 U.S.C. § 2254(d), disclosure of the letter does not expand the record that this court may consider in resolving such claims.[8]  At this early stage, disclosure simply places the parties and the court on equal footing in addressing all the issues raised by the parties, including the procedural defense asserted by respondent.

### III.  CONCLUSION

For all the foregoing reasons, petitioner's Renewed Motion for Disclosure of Ongoing *Brady* Material (Doc. 60) is GRANTED.  Within seven days of the date of this order, respondent shall provide the Corley letter to petitioner.  Within fourteen days following such disclosure, petitioner shall file a notice indicating whether he intends to seek leave to amend his habeas corpus petition.

DONE this 27th day of March, 2023.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE

---

62 (granting discovery on *Brady* claim) and doc. 128 at 35-37 (finding *Brady* claim procedurally defaulted and concluding Hammonds could not show cause and prejudice to excuse default).  Disclosure of the Corley letter will not preclude this same result here, if appropriate.

[8] The court is cognizant of the limitations on federal court record expansion when deciding claims governed by § 2254(d)(1) and (2).  *See Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); *id*. at 185 n.7 (recognizing that, by its express statutory terms, review of a state court's factual determinations under § 2254(d)(2) is similarly limited to the record that was before the state court when it decided the claim on the merits).